*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 08-CV-629, 08-CV-630, 08-CV-631 and 08-CV-632

MICHAEL R. ROSELLA, APPELLANT/CROSS-APPELLEE,

v.

LONG RAP, INC., *et al.*, APPELLEES/CROSS-APPELLANTS.

Appeals from the Superior Court
of the District of Columbia
(CAB-4316-06 and CAB-5758-06)

(Hon. Jeanette Jackson Clark, Trial Judge)

(Argued October 24, 2014                    Decided July 30, 2015)

*Lynne Bernabei*, with whom *Alan R. Kabat* was on the brief, for appellant/cross-appellee.

*Dale A. Cooter* for appellees/cross-appellants.

*Jason M. Zuckerman*, with whom *R. Scott Oswald* filed a brief, for the Government Accountability Project, the Metropolitan Washington Employment Lawyers Association, and the National Whistleblowers Center, as *amicus curiae* in support of appellant/cross-appellee.

Before FISHER and THOMPSON, *Associate Judges*, and PRYOR, *Senior Judge*.

PRYOR, *Senior Judge*:    Appellant/cross-appellee Michael Rosella ("appellant") filed an action in Superior Court alleging he was wrongfully discharged from his employment with Long Rap, Inc. ("Long Rap"), in retaliation

for his ongoing protests of Long Rap's accounting practices. He alleged that his supervisors feared that his expressed disapproval of Long Rap's accounting systems would negatively affect a planned business acquisition of the company, and that his employment was terminated in order to ensure a successful transaction. Although the trial court permitted appellant's wrongful discharge claim to proceed to trial, the jury entered a verdict in favor of Long Rap and its named officers. On appeal, appellant alleges multiple errors by the trial court and seeks a new trial. Concluding instead that appellant never stated a proper claim for wrongful termination in the first instance, we affirm the adverse judgment against him.

## I.

Long Rap was, at the time these proceedings were initiated, a privately owned corporation that operated a chain of clothing stores. It was operated by its three co-owners and officers, Charles Rendelman, Stuart Ezrailson, and Mitchell Kupchak.[1] Mr. Rendelman acted as Long Rap's Chief Executive Officer, and Mr. Ezrailson acted as Long Rap's President and Chief Merchandiser. Mr. Kupchak was not involved in day-to-day operating decisions within the company.

---

[1] Along with the three men named above, Long Rap acted through two additional officers: Wendy Sayer Ezrailson, Mr. Ezrailson's wife and Long Rap's Corporate Secretary, and Paul Donnellan, Vice President of Operations.

Long Rap hired appellant on a temporary basis in May 2005. In July 2005, appellant became a full-time at-will employee and began to serve as Long Rap's Director of Finance and Controller, a position similar to a Chief Financial Officer. Soon after this promotion, the relationship between Long Rap's officers and appellant began to deteriorate. Long Rap alleges its officers began to have concerns about appellant's work performance, including the timeliness of financial reporting, poor work ethic, and declining morale in the accounting department.

On the other hand, appellant alleges that after his promotion he began to question and object to a number of directives issued to him by Long Rap officers. Appellant's complaint detailed that he was directed to, *inter alia*, postdate checks in order to manipulate quarterly financial results, record transactions in different accounting periods than when they occurred, provide sizable cash advances and travel advances to the Rendelmans and Ezrailsons (without documentation), pay for the use of a private automobile for the owners out of corporate funds, and otherwise use corporate funds to pay the owners' personal expenses. Appellant's complaint alleges that he protested multiple "improprieties [and] illegalities" regarding Long Rap's accounting practices on the basis that they were contrary to generally accepted accounting principles. However, when appellant's protests did not cause any change in the practices, appellant largely complied with the officers'

orders. In a few instances appellant simply did not comply with the directives, or complied in a different manner.

Ultimately, in April 2006, the differences between the parties resulted in Long Rap terminating appellant's employment. On May 2, 2006, appellant delivered a demand letter to Long Rap indicating that he believed he had been wrongfully terminated from his position. Appellant asserted that he was fired because ongoing negotiations to sell Long Rap would require the potential purchaser, Blue Holdings, Inc. ("Blue Holdings"), to perform a check of Long Rap's finances. This check, appellant claims, would have involved consulting with him. Since appellant had multiple concerns about the propriety and legality of a number of Long Rap's financial matters, his consultation would have put the sale in jeopardy.[2]

On June 2, 2006, Long Rap responded to appellant's demand letter by filing suit against him, alleging negligence and breach of fiduciary duty. Appellant cross-filed a claim alleging wrongful termination in violation of public policy against Long Rap, and conspiracy claims against Mr. Rendelman and Mr. Ezrailson. The parties' cross-claims were consolidated and proceeded to a

---

[2] The sale did not occur.

jury trial. After the trial, the jury returned verdicts in appellant's favor on Long Rap's breach of fiduciary duty claim and in Long Rap and its officers' favor on appellant's wrongful termination claim. Appellant appealed from the verdict on his claims. Long Rap did not appeal the verdict on its breach of fiduciary duty claim, but cross-appealed the trial court's adverse summary judgment ruling dismissing its negligence claim.

After the cross-appeals were filed and briefed, Long Rap filed for bankruptcy. This appeal was stayed for approximately five years pending resolution of the bankruptcy proceedings. During those proceedings, Long Rap waived its appeal from the trial court's adverse summary judgment ruling dismissing its negligence claim.

Accordingly, the only question before this court is appellant's claim of wrongful discharge from employment by Long Rap. As part of that claim, he asserts that the trial court erred when it (i) instructed the jury that it must find that the conduct appellant complained of was actually illegal (ii) precluded certain expert or lay testimony regarding the legality of Long Rap's actions and (iii) admitted appellant's initial demand letter and suggested settlement sum into evidence.

## II.

It has long been the common law in this jurisdiction that an at-will employee may be discharged "at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991). We first recognized a non-statutory exception to this doctrine in *Adams*, concluding that it has become "universally accepted that an employer's discharge of an employee for the employee's refusal to violate a statute is a wrongful discharge in violation of public policy." *Id.* at 32. In that case, we reversed the court's grant of summary judgment on Mr. Adams' claim for wrongful termination, which alleged that he was discharged from his employment as a delivery truck driver after he refused to drive a truck without a visible inspection sticker on its windshield as required by District law. Guided by two decisions from the Supreme Court of Texas, we determined that a would-be plaintiff could properly invoke the cause of action where his employer "require[d] his or her employees to break the law as a condition of continued employment," *id.* at 32, and the plaintiff-employee was discharged solely because he refused to do so. *Id.* at 33-34. Nonetheless, we emphasized that this new exception to at-will employment was "very narrow." *Id.* at 33. Accordingly, we declined — like the Supreme Court of Texas — to "extend the exception to cover a claim by an employee that he was discharged for reporting

illegal activities by other employees to his employer." *Id.* at 34. In that situation, the plaintiff "was not forced to choose between risking criminal liability [and] being discharged from his livelihood," and thus was subject to discharge at the employer's discretion. *Id.* (quoting *Winters v. Houston Chronicle Publ'g Co.*, 795 S.W.2d 723, 724 (Tex. 1990)).

Although we have maintained that the wrongful termination in violation of public policy exception to at-will employment remains "narrow," we later concluded that *Adams* does not foreclose recognition of additional public policy grounds upon which an employee can claim wrongful termination. *Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997) (en banc). In that case, Ms. Carl asserted that she was discharged from her employment as a nurse with Children's Hospital after she advocated on behalf of patients' rights groups before the D.C. Council and testified on behalf of plaintiffs in medical malpractice claims. *Id.* She alleged that her termination violated, *inter alia*, her rights as a citizen to engage in political expression. *Id.* We held that Ms. Carl's wrongful termination claim could go forward even though, unlike Mr. Adams, she was not forced to partake in an illegal act or risk termination. *Id.* at 161. However, to maintain the "narrow" exception that *Adams* envisioned, we concluded that the

> court should consider seriously only those arguments that reflect a clear mandate of public policy — i.e., those that make a clear showing, based on some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.

*Id.* at 163 (Terry, J., concurring).[3] By tying new causes of action to statutory and constitutional provisions, we would refrain from defining "nebulous" concepts of public policy, and leave such definitions to the legislature, "which is in a far better position than a court to make policy decisions on behalf of the citizenry." *Id.* Further, the statutory anchor would prevent us from evaluating actions where the claimed public policy exception simply "tends to be injurious to the public or against the public good." *Id.* (quoting *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo. Ct. App. 1985)).

Applying this new exception to the policies alleged by Ms. Carl, we

---

[3] Judge Terry's concurring opinion was joined by a majority of the court in the standard by which we should evaluate future public policy-grounded exceptions to at-will employment and with regard to the public policy embodied by D.C. Code § 1-204, and accordingly it constitutes the effective holding of the en banc court. *Id.* at 166, 197 n.2.

concluded that D.C. Code § 1-224 (1981 ed.)[4] — although a criminal statute — embodied a policy protecting every citizen's right to testify before the legislature when it proscribed any endeavor to "influence, intimidate, or impede any witness in any proceeding before the Council," and prohibited "injuring any . . . witness in [her] person or property . . . on account of [her] testifying or having testified to any matter pending" before the Council. *Id.* at 165. The statute represents "a declaration of policy by the Council seeking to ensure the availability of information essential to its legislative function by imposing criminal penalties on anyone who seeks to impede Council access to such information." *Id.* An employer who terminated the employment of an employee solely for testifying before the Council could certainly "influence, intimidate, or impede" the employee's testimony, thereby limiting the Council's access to relevant information. Accordingly, Ms. Carl was permitted to demonstrate that her former employer wrongfully terminated her employment in a manner that violated the public policy set forth in D.C. Code § 1-224.

We also allowed a suit for wrongful discharge to go forward in *Washington v. Guest Servs., Inc.*, 718 A.2d 1071 (D.C. 1998). Ms. Washington alleged that she had been fired for insubordination because she tried to persuade a coworker to

---

[4] This section has been recodified at D.C. Code § 1-301.43 (2012 Repl.).

refrain from "spraying stainless steel cleaner in the area where Ms. Washington was cooking." *Id.* at 1072. We concluded that "[t]o permit an employee to be fired for such actions would undermine the purposes of the food and health regulations and would frustrate the public policy of which these regulations are an expression." *Id.* at 1080. We emphasized the close relationship "between Ms. Washington's discharge and the applicable public policy." *Id.*

As the court's approach has evolved to define new common-law torts of wrongful discharge from employment in violation of public policy, the legislature has seen fit to simultaneously create statutory exceptions to the employment-at-will rule by recognizing an employee's right to challenge wrongful discharges based on specific protections of public policy. For example, the District of Columbia Human Rights Act, D.C. Code § 2-1402.61 (2001), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3 (a) (2006), prohibit the discharge of an employee in retaliation for the employee's engagement in protected activity. *See McFarland v. George Wash. Univ.*, 935 A.2d 337 (D.C. 2007); *Bryant v. District of Columbia.*, 102 A.3d 264 (D.C. 2014). Those provisions serve to protect employees from "discrimination for any reason other than that of individual merit," and employees who engage in protected activity to expose discrimination against others. D.C. Code §§ 2-1401.01, 2-1402.61; *see also* 42 U.S.C. § 2000e-2.

Additionally, the Whistleblower Protection Act functions to protect *D.C.-government employees* who make protected disclosures "report[ing] waste, fraud, abuse of authority, violations of law, or threats to public health or safety" from retaliatory employment actions. D.C. Code §§ 1-615.5, 1-615.53. Protected disclosures include those "made in the ordinary course of an employee's duties by an employee to a supervisor . . . that the employee reasonably believes evidences . . . [a] violation of a federal, state, or local law, rule, or regulation[.]" D.C. Code § 1-615.52.

## III.

In this case appellant (and amicus) seek the inclusion of a "reasonable belief" standard into our existing case law making it akin to a whistleblower statute. Appellant's theory of the case was twofold. He urged that he had a reasonable belief that at least some of the employer's accounting practices were likely unlawful. Alternatively, he argued that the disclosure of his views would be problematic to a prospective purchaser of the company and that that fact led to his discharge. In these circumstances we conclude that appellant's showing of protected activity under the requirements of *Adams* and *Carl* is deficient. There is no showing that appellant, in this instance, was forced to choose between

continuing his employment or engaging in behavior that was unlawful or against a clear mandate of public policy. Rather appellant requests that we alter our requirement for a remedy for wrongful discharge of an at-will employee to a lesser requirement that the employee have a reasonable belief that he or she is being wrongfully discharged from such employment. This approach would undo the balance that now exists under our case law and would be a departure from our jurisprudence. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). Although appellant relies on *Washington*, we cannot discern the requisite close fit between appellant's discharge and the applicable public policy. Given our view of the case, we do not address appellant's other contentions concerning the manner in which the trial was conducted.

For the foregoing reasons, we affirm the adverse judgment against appellant.

*So ordered.*